Edward D. ROSARIO, Appellant,

v.

PEOPLE OF the TERRITORY OF GUAM, Appellee.

No. 21590.

United States Court of Appeals Ninth Circuit.

March 13, 1968.

As Amended March 29, 1968.

**870**

James F. Hewitt (argued), Federal Criminal Defense, San Francisco, Cal.; Finton J. Phelan, Jr., Agana, Guam, for appellant.

Harold W. Burnett, Atty. Gen., John P. Raker, Agana, Guam, for appellee.

Before DUNIWAY and ELY, Circuit Judges, and THOMPSON, District Judge.

ELY, Circuit Judge:

In an amended information containing seven counts, the appellant was charged with seven offenses of forgery, violations of section 470 of the Penal Code of Guam. He was tried in the District Court and found guilty by a jury of the offense described in count five of the amended information. He appeals from the judgment of conviction.

■ We find no merit in appellant's contention that since he was charged in each count with both the forging and the uttering of the particular instrument described in that count, he was improperly charged with two offenses in each single count and the District Court therefore erred in refusing to require the prosecution to elect between the two offenses. Section 470 of Guam's Penal Code was adopted in 1933 from section 470 of the Penal Code of California. In rejecting a contention similar to that under consideration, the California Supreme Court stated: "The averments in the indictment, in the same count, that appellant forged and uttered the instrument, did not constitute a statement of two separate and distinct crimes." People v. McGlade, 139 Cal. 66, 70, 72 P. 600, 601 (1903). Here, the court treated each count as charging only one offense, that of forgery, and instructed the jury to that effect in regard to the only count with which the jury eventually became concerned.

■ In the fifth count of the amended information, the appellant was accused of having forged a certain check drawn on the Guam Branch of the Bank of Hawaii. This check, dated October 21, 1966, was payable in the amount of $97.50 to the order of "Reyes, Edward R.," and was signed "Mac Jones." The appellant insists that the evidence was insufficient to support his conviction of having forged this particular check. In this connection, he first points to the fact that the instrument in question bears the signature "Mac Jones," with the first name of the purported maker spelled "Mac." In attempting to prove that the check was forged, the prosecution offered the testimony of one Mack Jones, whose first name, according to the record, is spelled, as indicated, "Mack." This witness testified that he did not sign the check in question, but the appellant argues, in the light of the discrepancy in the names, that the testimony is meaningless. In Marshall v. State, 116 Neb. 45, 215 N.W. 564 (1927), an alleged forger, intending to forge the signature of H. A. Timmerman, had mistakenly written the name "H. A. Timmerman." As to this, the Nebraska Supreme Court wrote: "It cannot be said as a matter of law that the variance in such names is so great as to prevent the deception of any person of ordinary prudence. The misspelling of the name was an error on the part of the

author of the forgery and the law does not permit him to use it as a shield to protect himself from the consequences of his criminal act." 116 Neb. at 52, 215 N.W. at 567. Here, the evidence, with the inferences which it permitted, was sufficient to support a conclusion that the individual who appeared as a witness and identified himself as "Mack Jones" was the same person whose signature was forged. There is nothing in the record to suggest that a "Mac" or "Mack" Jones, other than the witness, maintained an account under one of those names in the bank upon which the check was drawn.

The above notwithstanding, we cannot ignore certain irregularities which occurred before and during the course of the proceedings below. They require that the conviction be vacated.

At about 8 o'clock in the morning of October 29, 1966, Juan T. Blas, a witness for the prosecution, received a telephone call from one John Webster "in regards to a check that was a forged check that was cashed at the Bank of America." Mr. Blas occupied an official position in the Territory of Guam. He was the Commissioner of Yigo, the village in which he lived. Following the telephone call from Mr. Webster, identified by the prosecuting attorney in his opening statement as being the "head bookkeeper" of the bank, Commissioner Blas immediately called upon the appellant at the latter's home. There, according to the Commissioner's testimony, he had a conversation with the appellant in the presence of appellant's mother. Without having uttered any preliminary remarks or admonitions, the Commissioner asked the appellant if he was "the one who came to the Bank of America and cashed a forged check as payee, Edward R. Reyes?" The Commissioner testified that the appellant replied, "No, I was not." Thereafter, however, the questioning continued, and when Commissioner Blas made the statement, "If you are, you might as well just say the truth now," the appellant "came out and told me he did." His

precise language, according to the Commissioner, was, "Yes, I did, and I have written five others, five other checks." The appellant vigorously objected to the foregoing testimony of Commissioner Blas, basing his objection upon the fact that the Commissioner was required, and had failed, to warn the appellant in line with the teachings of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court overruled the objection "upon the ground that the witness has testified that he went over as a friend of the family and talked to the defendant. The defendant was not in custody." The ruling was apparently based upon certain testimony of Commissioner Blas as follows:

"Q. (By * * * [the prosecuting attorney]) Now how long have you known Edward D. Rosario?

"A. I have known him since he was a child.

"Q. Now what is your acquaintanceship, a casual or close friend?

"A. We are close friends with the family."

We are not convinced that the record supports the court's conclusion. The weight of the evidence establishes circumstances entirely inconsistent with the idea that the official hastened to appellant's home to pay a social visit as an old and "close" friend of appellant's family. We have seen that after the appellant had, in the beginning, denied any wrongdoing, the Commissioner persevered in his questioning. This is hardly consistent with the prosecution's theory that the interrogation was merely incidental to a social visit by a family friend. Moreover, during cross-examination of the Commissioner by appellant's attorney, the following occurred:

"Q. You visited him in your official capacity as Commissioner?

"A. As a service to the Bank of America.

"Q. You were acting as Commissioner.

"A. Because they called my attention—

"Q. Yes, but you were acting as Commissioner.

"A. *Yes, I am acting as Commissioner on 24 hours.*"

(Emphasis added.) The court had previously remarked that "it is the business of the Commissioner to enforce laws * * *." This expression reflected the provisions of the Government Code of Guam, which provide, *inter alia,* as follows: "Commissioners and Assistant Commissioners are authorized and empowered: * * * (b) To act as a peace officer in his jurisdiction." Guam Gov't Code § 15010 (1961). In view of all these considerations, it is doubtful that the record supports the conclusion that Commissioner Blas visited appellant's home on October 29th in a capacity other than his official one.

■ Whenever he acted in his official capacity, the Commissioner was of course required, prior to any custodial interrogation of the appellant, to give appellant the warnings specified in Miranda v. State of Arizona, supra.[1] For one to be in custody, it is not required that he be in handcuffs or even that he be advised in express terms that he is under arrest. The custodial question before the court was whether or not, in view of all the circumstances, the appellant's freedom of movement was, at the time of any challenged interrogation, restricted in a significant way by the presence of civil authority. Miranda v. State of Arizona, 384 U.S. at 444, 86 S.Ct. at 1602. We cannot see from the record before us that this particular issue was squarely confronted and resolved in regard to the interrogation which occurred at the appellant's home. That such is the case, however, does not affect the ultimate disposition of this appeal.

After the Commissioner had visited appellant's home, he took the appellant to his government office. The record does not reveal whether the appellant was invited to accompany him or directed to do so. In either event, the appellant, regardless of his previous status, then, without doubt, came under the custody of the interrogating officer, acting as an officer, within the meaning of *Miranda.* Not only was he then "deprived of his freedom of action in * * * [a] significant way," but he had also actually "been taken into custody." 384 U.S. at 444, 86 S.Ct. at 1612.

■ Commissioner Blas, however, still failed to advise appellant of any of his crucial rights or to warn him against their surrender. The interrogation continued and resulted in testimony at the trial that was probably more prejudicial to appellant than any other which was received. This consisted of admissions made by appellant to the Commissioner, in the Commissioner's office, as to the forging of five checks. During the course of this conversation, the Commissioner made notes in his "official * * * daily record." The notes contained entries as to the specific amounts of the five particular checks and the dates when the checks were cashed. The

1. The appellant's trial began on November 22, 1966. Since this was subsequent to June 13, 1966, the date of the *Miranda* decision, the *Miranda* rules were fully applicable to appellant's trial. Johnson v. State of New Jersey, 384 U.S. 719, 733, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). In *Miranda* the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."
384 U.S. at 478–79, 86 S.Ct. at 1630.

Commissioner referred to his "record" as he gave his oral testimony. In the presence of the jury, the prosecuting attorney stated, as to the Commissioner's record: "I am going to ask to have it put into evidence." While the court rejected the offer of the book into evidence, the use to which it was put, as well as the references made to it, emphasized the admissions which appellant had allegedly made while he was in custody and when, admittedly, he had not been admonished in compliance with the teachings of *Miranda*. It is clear, therefore, that the admission of this evidence over appellant's repeated objection was error.

This error was magnified by the court's eventual determination that there should be dismissal as to all counts except the fifth and that the evidence bearing upon the dismissed counts should be disregarded by the jury. The court reached this conclusion not only as to the objectionable evidence of the Commissioner reviewed above, but also as to the testimony of six other witnesses called by the prosecution.[2] In the presence of the jury, these witnesses were each shown a check described as to face amount, and each check was then marked as an exhibit for identification. Each witness testified that he had cashed the particular check shown to him or that he knew of its having been cashed. Yet when asked the crucial question which might have implicated the appellant, only two of the witnesses were able to identify the appellant as the one who had presented the check in question. One witness, George Baza, gave testimony which, in effect, exculpated the appellant. The check shown to him at the trial, Exhibit 6 for Identification, was written for the sum of $53.81, and Baza testified that the person who had presented it to him for cashing was "not in the courtroom." It is highly significant that the testimony of each of these witnesses in re-

gard to the respective checks shown to to him also related to the inadmissible testimony of Commissioner Blas concerning the entries made in his record during the interrogation which occurred after the accused had been taken into custody and removed to the Commissioner's office.

■ After the Government had rested its case, the court permitted it to reopen for the purpose of introducing six exhibits which had previously been identified but not offered into evidence. All of these exhibits were checks, including the one, Exhibit 6, which the witness Baza had cashed and which, according to the witness, was presented to him by someone other than the accused, that is, by a person "not in the courtroom" at the time the witness gave his testimony. Although the appellant objected to the offer of the checks into evidence, all of them were received and passed among the jurors for examination. Immediately thereafter, the appellant moved for a directed verdict of acquittal, whereupon, after some discussion, the Government moved to dismiss six of the seven counts of the amended information. The court granted the motion and then addressed the jury: "[D]uring your absence there was a discussion as to these various charges and the government has dismissed all of the charges contained in this amended information except the fifth count. So your deliberations will be confined to that count." The court did not, however, at this time, almost immediately after its members had examined the six exhibits, advise the jury as to how it should treat all of the prosecution's testimony that related only to counts other than the single one which remained. Thereafter, during the course of its instructions to the jury, the judge made a brief comment concerning this evidence. He remarked:

"Evidence was offered here for the purpose of showing the defendant

2. A seventh witness was called by the prosecution, but the court sustained an objection to his testimony based on the prosecution's failure properly to include the name of the witness in a list of witnesses furnished to the defendant.

committed *another act of forgery* prior to the time when he allegedly committed the crime described in the information. I think, gentlemen of the jury, you should ignore the evidence as to all other offenses except the one which is before you, count number five."

(Emphasis added.) In our judgment, this admonition was insufficient to accomplish the purpose for which it was made. It referred to evidence of "another act of forgery," a single act, whereas it could not have been possible for the jury to believe other than that the evidence, eventually determined to be immaterial, was offered for the purpose of showing that the accused had committed several acts of forgery. Additionally, while the court instructed the jury at some length concerning the "confession" made by the accused to the Commissioner, it did not specifically instruct the jury to disregard such portions of the "confession" as related to the six counts dismissed by the court upon the motion of the prosecution.

▆ The trial commenced at 9:30 in the morning of November 22, 1966, and the beginning of the instructions to the jury occurred at 2:32 in the afternoon of the same day. This is another cirsumstance leading to the conclusion that the appellant is entitled, in the interest of essential fairness, to a new trial. When, in a proceeding of such brief duration, practically all of the testimony, however prejudicial, becomes immaterial because the party who has introduced it chooses to abandon the issues to which it related, it is not likely that the jurors will be able wholly to comply with a comparatively casual instruction to disregard that testimony. Here, an impossible intellectual burden was quite suddenly imposed upon the jury.

The appellant makes other contentions, but in light of the foregoing, we need not discuss them.

Reversed and remanded.